# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

**PEGGY BANKS,**                                    **Case No.**

     Plaintiff,                              **1:25-cv-00851**

v.

**BIO TRUST NUTRITION, LLC,**

    Defendant.

_____/

---

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTIONS TO BIFURCATE DISCOVERY AND FOR PROTECTIVE ORDER

The Court should deny Defendant Bio Trust Nutrition, LLC's ("BioTrust" or "Defendant") motions to bifurcate discovery and for a protective order (ECF Nos. 14, 15) in their entirety because bifurcation and discovery limitations in this case would be inefficient and prejudicial, especially when considering the correspondingly limited additional classwide discovery called for by the needs of this case.

Defendant contends that Plaintiff consented to receive text messages by checking a consent box when placing an online order in September 2020, and that her claims therefore rest on a "false premise." (Def.'s Mot. to Bif. at 1, ECF No 14). Needless to say, as the Declaration of Peggy Banks makes clear, the Plaintiff disputes this contention or that she checked any box. However, based on this assertion, Defendant argues that discovery should be limited to individualized facts surrounding Plaintiff's purchase, which Defendant claims should allow the Court to resolve the case on the merits without the need for class discovery. Defendant further contends Plaintiff isn't entitled to any information about the Defendant or its texting practices, even if they relate to Plaintiff. But, as Plaintiff points out, the ESI and calling records in this case

1

are just as readily obtainable for the Plaintiff as other class members, which casts significant doubt for Defendant's burden argument. Contrary to the Defendant's claims, the overlap between individual and class discovery is far from "minimal;" there is significant overlap between what happened here with respect to the Plaintiff as other class members, in addition to a relatively minimal additional burden attendant to individualized and classwide discovery.

What's more, Defendant's claims of consent are unsupported and implausible. First, Defendant has not produced any evidence, nor identified any record, showing that Plaintiff actually checked a consent box when placing her order. All it rests on is rank speculation that she did so because she ended up receiving text messages, *four years after the fact.*

Second, the circumstances under which Plaintiff began receiving text messages make Defendant's theory highly improbable. Plaintiff did not receive any text messages from BioTrust at or near the time of her purchase or alleged consent. Instead, she began receiving unsolicited messages more than 18 months after her last transaction with BioTrust-a pattern strongly indicative of a "win-back" campaign or a mass upload of customer data without corresponding consent data to a text messaging platform, rather than an isolated, consent-based communication.

Plaintiff's theory is that BioTrust (or its vendor) either switched messaging platforms, imported customer contact lists without verifying consent, or otherwise mishandled its opt-in records-systemic conduct that likely impacted the entire class. Discovery is therefore necessary to uncover whether this systemic error or misconduct occurred and whether BioTrust sent unauthorized messages to other consumers in the same manner. These issues are at the heart of both Plaintiff's individual claim and the class claims, making bifurcation inappropriate and prejudicial. For these reasons, the Court should deny Defendant's motions in their entirety.

2

I.      **Defendant's Theory Is Unsupported by Evidence and Implausible Given the Timing of the Messages**

BioTrust's entire argument for bifurcation rests on its assertion that Plaintiff consented to receive text messages by checking a box during a September 2020 order she is alleged to have placed. Yet, BioTrust has provided *no evidence* showing that Plaintiff *actually* checked the box on its website when Plaintiff allegedly placed her order, a fact which the Plaintiff disputes. Instead, BioTrust relies on a screenshot of what a customer supposedly "would have encountered" on its website. (ECF No 14 at 3-4). It then makes the unsupported logical leap to argue that the Plaintiff *must have* checked the box because that's the only way the Plaintiff would have ended up receiving the subject text messages, four years after the order was placed. Plaintiff's declaration makes clear she didn't check anything and that conclusion doesn't follow.

What a person "would have encountered" or what they would have seen is not evidence of what they *actually* did or *actually* submitted on a website. It is not evidence that the box to receive messages was checked at the time of the initial order any more than that of receiving a spicy dish from a takeaway (let alone four years after the fact) is evidence that the "spicy" box was checked on the takeaway's order form. Sure, that may be the most plausible *ordinary* explanation, but can be rendered implausible when a customer, as here, expresses a preference for non-spicy foods; in such a circumstance, it is more plausible that someone simply messed up the order. Thus, Defendant's screenshot of its order form is nothing more than rank speculation of the fact that the Plaintiff checked the box because she ended up receiving text messages four years later. That would be akin to the same individual attributing heartburn to their purchase of a spicy dish four years earlier. This speculative assertion, unsupported by any documentary evidence specific to Plaintiff, and directly contradicted by the Plaintiff's own declaration, does not justify limiting discovery to an individualized consent inquiry.

3

As alluded to above, further undermining BioTrust's theory of consent is the timing of

the text messages at issue. Plaintiff did not receive any messages immediately following the

2020 order she is alleged to have placed. Instead, she began receiving text messages four years

later. Defendant provides no explanation for why it waited four years to text the Plaintiff if she

indeed checked the box in 2020. It would be illogical for a profit-maximizing business to ask a

customer to send them "recurring automated marketing text messages" so that they can be kept

"up to date on news and exclusive offers," only to wait four years and then begin texting. To the

contrary, waiting four years to contact someone is the antithesis of keeping them "up to date." If

Plaintiff had truly consented, it is implausible that she would have received no messages for four

years only to be contacted suddenly. Indeed, two other TCPA-specific class action campaigns

appear far more likely: either that the Plaintiff was texted in connection with a so-called "win-

back" campaign, or the Plaintiff was erroneously texted when a list of unconsented to telephone

numbers was loaded into the Defendant's telephone system in error.

A win-back campaign is a marketing effort aimed at re-engaging former customers after a

lapse in communication, often through unsolicited text messages or calls encouraging renewed

business. While such campaigns may be common in the marketing space, they are unlawful

under the TCPA if directed at individuals whose relationship with the company has expired or

who have not given valid prior express consent. The TCPA regulations provide that a business

may only rely on an established business relationship ("EBR") to send unsolicited messages to a

customer, such as in a win-back campaign, if the customer's last purchase or transaction

occurred within eighteen months of the message. Specifically, the regulation defines an EBR as:

> [A] prior or existing relationship formed by a voluntary two-way communication
> between a person or entity and a residential subscriber with or without an exchange
> of consideration, on the basis of the subscriber's purchase or transaction with the

entity within the eighteen (18) months immediately preceding the date of the telephone call ..., which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(f)(5).

Once the eighteen-month period lapses, the EBR exception no longer applies, and unsolicited marketing text messages, including those sent in connection with a win-back campaign, violate the TCPA, absent valid express consent. For example, in *Williams v. Pisa Grp., Inc.*, No. CV 18-4752, 2023 WL 2227697, at *6 (E.D. Pa. Feb. 24, 2023), the Court certified a class of former newspaper subscribers whom a newspaper called more than 18 months after the subscribers terminated their newspaper subscription, "marking the expiration of any EBR." Similarly, in *Wakefield v. ViSalus, Inc.*, the Ninth Circuit affirmed an almost $1 billion class action verdict against a company who engaged in a "WinBack campaign, designed to entice former promoters and customers to return to or reactivate their ViSalus memberships by offering promotional pricing on ViSalus products." *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1115 (9th Cir. 2022). There, the named Plaintiff, like the Plaintiff here, "enrolled to be a ViSalus promoter in 2012, and voluntarily provided her phone number to ViSalus on her enrollment application. After discontinuing her relationship with ViSalus a few months later and receiving written confirmation of the termination of the relationship in March of 2013, Wakefield had no further contact with the company until April 2015, when she received five prerecorded audio messages from ViSalus on her home phone as part of the WinBack Campaign." *Id.*

Plaintiff's allegations, that she received text messages years after her last alleged transaction, are entirely consistent with such a campaign, mirror the facts of *ViSalus* almost identically, and directly contradict Defendant's consent theory. These facts support a systemic

misconduct theory of simply messaging old customers, regardless of whether they consented, not

an individualized consent dispute.

## II.    Plaintiff's Theory of Systemic Conduct Is the More Probable Explanation and Necessarily Requires Overlapping Merits and Class Discovery; The Proposed Bifurcation is Inefficient and Prejudicial

Plaintiff's theory and pleading, as supported by the Plaintiff's accompanying Declaration,

is straightforward: she did not consent, and for some reason BioTrust texted her and all other

class members four years (more or less) later. The most plausible explanation for this conduct is

that, for some yet-unknown reason, BioTrust loaded its *entire* customer list, consisting of *both*

those customers who did and did not consent (i.e. both those customers who checked the box and

those, like Plaintiff, who did not), into its text messaging system, and then erroneously texted

them all. The reasons this could occur may vary, and range from the deliberate, such as

uploading an entire list without respect to consent as part of an explicit win-back campaign, to

the relatively innocuous, such as mistakenly uploading the "do not call" list to the list of

individuals that should be texted. Whether this occurred due to a system change, data import

error, or failure to track consent accurately, these are not individualized issues. In any of the

factual scenarios pled, they all constitute TCPA violations that entitle the Plaintiff to classwide

discovery to suss out exactly what occurred with respect to all class members (and, at the same

time, the Plaintiff). They raise class-wide questions about BioTrust's business practices,

requiring class-wide discovery into its consent tracking, customer list management, vendor

relationships, and text messaging campaigns. This discovery necessarily overlaps with both the

merits of Plaintiff's claim and the requirements for class certification under Rule 23.

Bifurcation of discovery is often "counterproductive." Manual For Complex Litigation

(Fourth) ("MCL 4th") § 21.15 (2015). To begin, the proposed bifurcation guarantees that the

6

parties will need to duplicate their work, especially on the Plaintiff's theory as articulated above and the Plaintiff's own declaration. First, the parties would undertake "individual" discovery and all that entails: written discovery requests, depositions, and then expert disclosures and expert depositions, all limited just to the individual claim of the Plaintiff, including as to her putative claims of consent. Then, Defendant would file a dispositive motion to Plaintiff's individual claims. And then, should the Court deny that motion, the parties have to start all over again, serving discovery requests and taking depositions of the same witnesses a second time, for the same exact consent information, but this time focusing on classwide issues of consent premised on the *very same set of evidence with respect to the Plaintiff*. And after that, there would be a second round of dispositive motions on the class claims. In other words, the parties would engage in much the same discovery differing only in scope of information that is already ESI and just as readily produced in digital format for one individual as one million.

All told, this means at least two rounds of written discovery for essentially the same evidence, differing only in scope, two rounds of depositions (with the same witnesses being deposed twice), and then two rounds of summary judgment briefing. This is the opposite of judicial economy. Indeed, "bifurcation of discovery in this case will increase litigation expenses by protracting the discovery period and by duplicating the discovery process, including the depositions." *Hartley-Culp v. Credit Mgmt. Co*, No. 3:cv-14-0282, 2014 U.S. Dist. LEXIS 130308, *10 (W.D. Pa. Sept. 15, 2014). The Court should deny Defendant's motion to bifurcate for this reason alone. *See id.* (denying similar motion to bifurcate merits and class discovery in a TCPA case); *EQT Prod. Co. v. Terra Servs., LLC*, No. 14-1053, 2014 U.S. Dist. LEXIS 203680, *4 (W.D. Pa. Oct. 21, 2014) ("Terra's proposal would likely result in deposing the same witnesses twice-once in the liability phase, and again in the damages phase. This is the

definition of inconvenience, and the additional cost of duplicative depositions and document review combine to counsel against bifurcation in this case.").

Courts have repeatedly recognized that bifurcating merits and class discovery is often impractical and inefficient because the two are frequently intertwined, also leading to needless discovery disputes. Class certification requires a "rigorous analysis" under Rule 23 - one that "will frequently entail overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); see also *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012). This is especially true in TCPA class actions, where courts have noted that "[t]he distinction between class certification and merits discovery is murky at best and impossible to determine at worst." *Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. 15-2057, 2018 WL 501413, at *3 (C.D. Cal. Jan. 5, 2018).

To that end, both the records themselves of the individuals that the Defendant contacted, together with the associated order and consent records, are simply readily available electronically stored records of the type that courts routinely hold are readily accessible on a daily basis, negating any allegations of burden. Once those records are collected, which is no more burdensome for records with respect to the Plaintiff than other class members, then the Plaintiff, not the Defendant, will then bear the cost of having her expert analyze them. Simply put, there is little to no burden or prejudice on the Defendant and a great prejudice to the Plaintiff, who would be deprived of the information she needs to develop her theory of the case, propound additional discovery, and make the "rigorous" showing she is required to at class certification.

As such, apart from the duplication of discovery outlined above, Defendant's proposal is

bound to lead to additional discovery disputes and proceedings that would be completely
unnecessary without bifurcation. There is significant overlap between discovery relevant to the
merits of Plaintiff's individual claims and issues of class certification. Indeed, "[class
certification] analysis will frequently entail overlap with the merits of the plaintiff's underlying
claim . . .  because the class determination generally involves considerations that are enmeshed
in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp.*, 569
U.S. at 33-34 (cleaned up); *Charvat v. Plymouth Rock Energy, LLC*, No. 15-CV-4106, 2016
U.S. Dist. LEXIS 6778, at *6 (E.D.N.Y. Jan. 12, 2016) (denying motion to bifurcate merits and
class discovery in TCPA action and explaining that "bifurcation would have the opposite effect
[of "promot[ing] judicial efficiency or a prompt resolution of the case"]."); *Lakeland Reg'l
Med. Ctr. v. Astellas US, LLC*, No. 8:10-cv-2008, 2011 U.S. Dist. LEXIS 16684, *4 (M.D. Fla.
2011) ("[T]he line between 'class issues' and 'merits issues' is practically difficult, if not
impossible, to determine."); Notes of Advisory Committee on 2003 Amendments to Fed. R.
Civ. Pro. 23(c)(1)(A) ("Active judicial supervision may be required" to avoid "an artificial and
ultimately wasteful decision between 'certification discovery' and 'merits discovery.'"). As
another Court ruled when denying a motion to bifurcate in a TCPA case:

> The Court has reviewed the parties' joint status report. The Court does not see a
> need to bifurcate discovery in this case. There will be some overlap in discovery
> here. Discovery as to commonality and typicality under Rule 23 will also apply to
> the merits of the claim. Moreover, the Supreme Court in *Walmart v Dukes* has said
> the district court must conduct a rigorous analysis in determining class certification
> and that will often require some evaluation about facts that go to the merits of a
> plaintiff's underlying claims. Thus, bifurcating discovery often does not make sense
> as the lines between "class discovery" and "merits discovery" are significantly
> blurred.

*Katz v. Allied First Bank, SB*, No. 22-cv-5277, ECF No. 14 (N.D. Ill. Jan. 3, 2023). Other
courts have agreed. Recognizing this reality, courts routinely deny bifurcation in TCPA and

other class cases, finding that it would "belie principles of judicial economy, as the Court may be forced to spend time and resources resolving discovery disputes over what is 'merit' discovery as compared to 'class' discovery." *In re Plastics Additives Antitrust Litig.*, 2004 U.S. Dist. LEXIS 23989, *9 (E.D. Pa. Nov. 29, 2004) (citing *In re Hamilton Bancorp. Inc. Securities Litigation*, No. 01-CIV-0156, 2002 WL 463314, at *1 (S.D. Fla. Jan. 14, 2002) (noting that "bifurcation of discovery may well-increase litigation expenses by protracting the completion of discovery, coupled with endless disputes over what is 'merit' versus 'class' discovery"); see also *Nock v. PalmCo Admin., LLC*, No. 24-CV-00662-RDB, 2025 WL 100894, at *3 (D. Md. Jan. 15, 2025). ("Because individual and class discovery overlaps, the difficulty of drawing the line between the two is likely to cause further discovery disputes and place greater demands on the Court's time. This result also implicates the third factor, judicial economy, and weighs against bifurcation.").

Furthermore, there is no indication that the Defendant gathered telephone numbers in a materially different way than it gathered the Plaintiff's, as the aforementioned faulty programming or win-back campaign theories apply uniformly to all members of the Class and across the Class. As such, the Defendant's purported consent is substantially the same for all putative class members. *See, e.g.*, *Grippo v. Sugared + Bronzed, LLC*, No. SA CV 24-01792-AB (DFMX), 2025 WL 596095, at *2 (C.D. Cal. Feb. 24, 2025) (relying on several TCPA cases in rejecting a bifurcation of discovery holding, "the distinction between merits discovery and class discovery is not always clear, and many courts are, for this reason, reluctant to bifurcate class and merits discovery."); *Blair v. Assurance IQ LLC*, No. 23-16, 2023 WL 6622415, at *6 (W.D. Wash. Oct. 11, 2023); *Ahmed*, 2018 WL 501413, at *3 ("[T]he distinction between class certification and merits discovery is murky at best and impossible to determine at worst.").

As another Court in Texas held recently while rejecting a substantially similar bifurcation

request from a TCPA defendant highlighting the signification overlap between merits and class

certification discovery in a TCPA case while providing an overview of relevant case law:

> As to class certification under Rule 23, the Supreme Court has instructed that "certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-351, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)).

> And "[f]requently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (cleaned up).

> Considering *Dukes* and the "rigorous analysis" requirement for class certification, district courts have been reluctant to bifurcate class-related discovery from discovery on the merits. *See Ahmed v. HSBC Bank USA, Nat'l Ass'n*, No. EDCV152057FMOSPX, 2018 U.S. Dist. LEXIS 2286, 2018 WL 501413 (C.D. Cal. Jan. 5, 2018) (declining to bifurcate discovery in TCPA case and stating that "the distinction between class certification and merits discovery is murky at best and impossible to determine at worst"); *Chen-Oster v. Goldman, Sachs & Co.*, 285 F.R.D. 294, 300 (S.D.N.Y. 2012) (collecting cases).

> In another TCPA case, *Cardenas v. Resort Sales by Spinnaker, Inc.*, No. 9:20-cv-00376-RMG, 2021 U.S. Dist. LEXIS 34923, 2021 WL 733393 (D.S.C. Feb. 24, 2021), the Court found that bifurcation would not serve the interests of judicial economy given the plaintiff's "persuasive argument that the evidence needed to determine whether [they] have a claim substantially overlaps with [their] ability to represent a class under [Rule] 23." *Cardenas*, 2021 U.S. Dist. LEXIS 34923, 2021 WL 733393, at *3.

> Similarly, here, the undersigned already found that Folsom "may not avoid appropriate classwide discovery that is - as Bond persuasively argues - necessary for a future class certification motion." Dkt. No. 28. And, so, the Court agrees with Bond that bifurcation would not promote efficiency because there is considerable overlap between discovery relevant to the merits of his individual claims and issues of class certification. *Accord True Health Chiropractic, Inc. v. McKesson Corp.*, 2015 WL 273188, *2-3 (N.D. Cal. 2015) (declining to bifurcate a TCPA class action and noting that individual and class discovery claims typically overlap).

> And, in light of the bulk of authority discussing the lack of a "bright line" distinction between merits and class discovery, bifurcation could lead to avoidable, future disputes over whether a particular discovery request relates to the merits or

11

to class certification. *See Quinn v. Specialized Loan Servs., LLC*, 321 F.R.D. 324, 327-28 (N.D. Ill. 2017); *see also City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.*, 2015 U.S. Dist. LEXIS 79392, 2015 WL 11120408, *1-2 (W.D. Ark. 2015) (bifurcation may force the court to resolve "endless discovery disputes"); *True Health*, 2015 U.S. Dist. LEXIS 7015, 2015 WL 273188, at *3 (finding that bifurcation "raise[s] a slew of issues as to what discovery relates to the class, as opposed to the named plaintiffs, thereby causing additional litigation regarding the distinction between the two.").

And, so, considering the binding law from *Dukes* and persuasive authority from other district courts, the Court declines to bifurcate discovery in this case.

*Bond v. Folsom Ins. Agency LLC*, No. 3:24-CV-2551-L-BN, 2025 WL 863469, at *2-3 (N.D. Tex. Mar. 19, 2025). This Court should hold the same.

### III. Limiting Discovery Through a Protective Order Would Prejudice Plaintiff and Contradict the Presumption Against Discovery Restrictions in This District

Courts in this District have repeatedly recognized that discovery limitations are disfavored, especially where they risk delaying access to evidence critical to a plaintiff's claims such as those sought by the instant protective order. See *Aspen Corp., Inc. v. Gorman*, No. 18-cv-01325-CMA-SKC, 2019 U.S. Dist. LEXIS 9207, at 2 (D. Colo. Jan. 18, 2019) (explaining that "stays are the exception in this judicial district, not the rule" and that "[i]f a stay of discovery had been sought, it likely would have been denied, as the normal practice in this district is not to stay discovery pending decision a dispositive motion."); *Bustos v. United States*, 257 F.R.D. 617, 623 (D. Colo. 2009) ("This District generally disfavors stays of discovery."); *Sebastian v. GreenLink Int'l, Inc.*, 2021 U.S. Dist. LEXIS 236572, at *3–4 (D. Co. 2021). And, as an initial matter, much the same disputes as to what constitutes "class" versus "individualized merits" discovery will become apparent through adjudication of the Defendant's sought protective order, as it in essence seeks to *trifurcate* discovery into an extremely narrow issue of the Plaintiff's

12

putative consent while at the same time denying the Plaintiff discovery into her theories or the

Defendant's own business practices relating to sending text messages relevant to her theory.

When exercising its discretion to stay or otherwise limit discovery, this Court considers

the *String Cheese Incident* factors: (1) the plaintiff's interest in proceeding expeditiously with

discovery and the potential prejudice to the plaintiff of a delay; (2) the burden on the defendant

of proceeding with discovery; (3) the convenience to the court by staying discovery; (4) the

interests of nonparties; and (5) the public interest. *String Cheese Incident, LLC v. Stylus Shows,

Inc.*, No. 1:05-CV-01934-LTB-PAC, 2006 WL 894955, at *2 (D. Colo. Mar. 30, 2006).

The *String Cheese Incident* factors counsel against the Defendant's sought protective

order. As an initial matter, Defendant does not even cite a pending motion, but rather the alleged

burdens attendant class discovery and even certain types of *individualized discovery*, burdens

that it will have to deal with in either circumstance, including in the threatened early motion for

summary judgement it apparently will seek, which are little to no greater than the burdens of the

discovery on the Plaintiff's claims. Particularly as this is a class action, the public interests favor

against granting the sought protective order into discovery into what may well be viable class

claims on the theories Plaintiff has articulated. And, given the theories Plaintiff has articulated

and their uniformity with respect to the entire class, it would provide little convenience to the

Court to limit discovery into the class claims, particularly as no dispositive motion is pending.

Defendant has failed to carry its heavy burden to justify a protective order limiting

discovery, let alone to the narrow issue of the Plaintiff's consent, while at the same time denying

Plaintiff discovery into what may well prove to be class-dispositive evidence, such as evidence

that the Plaintiff's number was erroneously loaded into the Defendant's system, despite her lack

of consent. Defendant asserts that limitation is warranted because it may win at summary

judgment because of the Plaintiff's consent. But, as the Plaintiff points out, those same issues
pervade each and every other class member: What if BioTrust uploaded its entire customer list
by accident? What if BioTrust engaged in an impermissible win-back campaign to customers
who did not consent? In such instances, the Plaintiff is entitled to know that this is what
happened, and in such circumstances, each class member would have a case. Rank speculation as
to the Plaintiff's consent, in the absence of any evidence to the same, and in the face of a
contrary declaration, does not constitute good cause to justify a stay, even at the motion to
dismiss stage, let alone now, where discovery is presumptively open for all purposes.

"Had the Federal Rules contemplated that a motion to dismiss under Fed. R. Civ. P.
12(b)(6) would stay discovery, the Rules would contain a provision to that effect." *Valenzuela v.
Crest-Mex Corp.*, No. 3:16-cv-1129-D, 2017 U.S. Dist. LEXIS 98963, 2017 WL 2778104, at *5
(N.D. Tex. June 26, 2017). Moreover, Defendant's argument at summary judgment is not likely
to succeed in any event to the extent that the Defendant will be unable to prove that the Plaintiff
*actually* checked the box. Indeed, if Defendant had evidence of the same, why hasn't it produced
the subject record and instead only relied on a screenshot of what the Plaintiff allegedly saw?

Defendant seemingly has all the other information about the Plaintiff's putative order,
including "the date and time, product, price, first and last name, shipment address, email, and
phone number," ECF No. 15, p. 2, but it *does not* have any record of whether the Plaintiff
actually checked the box or not. Even so, as the Plaintiff points out, Defendant's protective order
motion seeks an incredibly limited and narrowed scope of discovery with respect to even the
Plaintiff's consent, which will deny Plaintiff the discovery to which she is entitled on her own
legal theories, which would be sufficient in any event to address the consent issues on an class
basis. In essence, Defendant advocates "discovery for me, but not for thee," contrary to the

14

Rules. (ECF No. 15, p. 1 (requesting "deferring *all other discovery*" except for discovery *solely* to matters relevant to Plaintiff's individual transaction history and her consent)). Shockingly, Defendant doesn't even concede and opposes permitting discovery into its own business practices, including the vendors it used, its previous texting campaigns, and procedures through which it loaded the Plaintiff's number into its system to receive text messages.

To this end, information the Plaintiff has already sought about Defendant's previous texting campaigns that the Defendant takes issue with is relevant because such information may be dispositive of the Plaintiff's theories. For example, if Defendant recently moved to a new texting service provider but failed to transfer consent data in the migration from the old provider, that may provide a plausible (and TCPA-violative) explanation for why the Plaintiff was contacted four years after she is alleged to have placed an order. That would also explain why the Plaintiff did not previously receive messages: the old provider's records may have accurately reflected the fact that the Plaintiff did not consent, and that record did not get transferred over. Nor is it at all clear why the Defendant claims that providing such basic information as the vendors involved in the sending of the messages at issue and their dates of use is overly burdensome. To the contrary, such basic information as the identity of the phone providers at issue is routinely disclosed in Rule 26(a)(1) disclosures. So too with sources of consent evidence, which Defendant will already need to produce to meet its burden of proving consent.

Plaintiff will therefore be prejudiced by a discovery limitation because the proposed protective order essentially guarantees that the Plaintiff will be unable to seek discovery into the manner, means, and circumstances in which her number, and those of all other class members, was loaded into the dialer to get texted, including the dates and circumstances of the loading which may expose a viable theory while at the same time accounting for the Defendant's

contention that an order was placed. By contrast, the limitation Defendant seeks to impose would therefore prevent the Plaintiff from taking discovery into her erroneous loading, incorrect programming, win-back campaign, and other related theories and proving them while at the same time giving the Defendant an unfair advantage in discovery only related to Plaintiff. Defendant's protective order motion heavily stacks the deck in its favor before the first card is dealt.

It also bears mentioning that the Defendant has not yet produced any admissible evidence in its motion tending to show that the Plaintiff *actually* checked the box on the order form, or even what the terms and conditions attendant to that checked box were. In discovery, Defendant was requested to produce, but thus far has refused, to even identify what data it had attendant to the Plaintiff and her purported order, let alone a plausible explanation for why she only started receiving messages after four years. The discovery Plaintiff has propounded is aimed at answering those questions. Those issues are far from "merits questions far beyond her individual claim and matters irrelevant to the threshold issue of her consent to receive the challenged text messages;" to the contrary, they are uniform, classwide answers to the questions of how the Plaintiff can meet the Defendant's affirmative defense of consent.

The protective order sought would further prejudice Plaintiff because, "with the passage of time, the memories of the parties and other witnesses may fade, witnesses may relocate or become unavailable, or documents may become lost or inadvertently destroyed." *Sanaah v. Howell*, 2009 No. 08-cv-02117-REB-KLM, U.S. Dist. LEXIS 35260, *2 (D. Colo. Apr. 9, 2009). A delay from a protective order limiting discovery would in fact prejudice Plaintiff and other class members by amplifying the risk that evidence will be lost or destroyed. *See, e.g.*, *Saleh v. Crunch, Ltd. Liab. Co.*, No. 17-62416-Civ-COOKE/HUNT, 2018 U.S. Dist. LEXIS 36764, at *4-5 (S.D. Fla. Feb. 28, 2018) ("a stay would prolong this matter on the Court's docket and

16

could conceivably prejudice Plaintiff by the fading memory of any witnesses"); *Lathrop v. Uber Techs., Inc.*, No. 14-CV-05678-JST, 2016 WL 97511, at *4 (N.D. Cal. Jan. 8, 2016) (plaintiffs in putative class action may "suffer prejudice from a stay because the case would extend for an indeterminate length of time, increase the difficulty of reaching class members, and increase the risk that evidence will dissipate").

The risk to the putative class members' interests is not merely hypothetical. Multiple decisions in TCPA class action cases have turned on the destruction of records necessary to identify class members. *See, e.g.*, *Levitt v. Fax.com*, No. 05-949, 2007 WL 3169078, at *2 (D. Md. May 25, 2007) (denying class certification in a TCPA case because "critical information regarding the identity of those who received the facsimile transmissions" was not available); *Pasco v. Protus IP Solutions, Inc.,* 826 F. Supp. 2d 825, 831 (D. Md. 2011) (granting the defendant summary judgment for the substantially the same reason). As such, courts regularly permit plaintiffs to commence full classwide discovery in TCPA cases immediately, even during the pendency of Rule 12 motions. *See, e.g.*, *Cooley v. Freedom Forever LLC et. al*., No. 2:19-cv-562, ECF No. 37 (D. Nev. July 19, 2019); *Cooley v. First Data Merchant Services, LLC et. al.*, No. 19-cv-1185, ECF No. 32 (N.D. Ga. July 8, 2019); *Abante Rooter and Plumbing, Inc. v. Birch Commc'ns, Inc.* No. 15-cv-03562, Dkt. No. 32 (N.D. Ga. 2016); *Mey v. Interstate National Dealer Services, Inc., et al.*, No. 14-cv-01846, Dkt. No. 23 (N.D. Ga. Aug. 19, 2014).

By contrast, Defendant will not be prejudiced at all if Plaintiff is permitted to proceed with discovery in the ordinary course. As another federal court explained in denying a motion to stay discovery in a TCPA case:

> In addition, [defendant] has not demonstrated irreparable injury; it notes only that it is potentially on the hook for substantial damages, given the putative nationwide class. Monetary damages, of course, do not by themselves constitute

17

> irreparable injury. [plaintiff], on the other hand, persuasively argues that she
> would be injured by a stay, particularly because discovery has yet to commence,
> and evidence is at risk of being lost. This injury, which is both likely and
> irreparable, far outweighs the injury posed by a potential future judgment for
> money damages.
>
> *      *      *
>
> In the meantime, it is clear that critical evidence, including records from any
> third parties that [defendant] may have contracted with for its telephone
> marketing, may be lost or destroyed.

*Simon v. Ultimate Fitness Grp., LLC*, No. 19-cv-890, 2019 U.S. Dist. LEXIS 147676, at \*18, 21-22 (S.D.N.Y. Aug. 19, 2019).

Thus, each of the *String Cheese Incident* factors counsel against the protective order sought, particularly insofar as the proposed protective order imposes an incredibly limited one-way discovery that is impermissible under the Rules.

## IV.    This Case is Distinct from *Ragsdale* Because it Involves Systemic Practices, Not Individualized Consent

Defendant's reliance on *Ragsdale v. Harmony Leads, Inc.* is misplaced. In *Ragsdale*, the dispute could be decided on "discrete, narrow issues", and limiting the initial discovery to such individualized consent issues would save the parties and the court time and resources. *Ragsdale v. Harmony Leads, Inc.*, No. 1:24-CV-02510-CNS-SBP, 2025 WL 1617233, at \*2 (D. Colo. May 9, 2025). In *Ragsdale*, just as here, the defendant claimed that it had consent to contact the plaintiff and the plaintiff denied that contention. But that's where the similarities to that case end. Unlike there, here, it is undisputed that the Plaintiff received the subject text messages *four years* after her putative order. As the Plaintiff points out, that fact alone begs the question as to why the Plaintiff was texted so long after her alleged order. And as the Plaintiff further points out in her declaration, she would never have checked the box to receive promotional text messages because

18

she *does not want to receive them*. And the Plaintiff has pled two equally plausible theories that explain why she received the messages alleged, both of which are entirely consistent and provide the most plausible support for the Plaintiff's theory of the case: that she did not check the box but was later erroneously recorded in some way or another as having done so. Far from being individualized, proving whether the Defendant obtained sufficient classwide consent in the face of a set of erroneously-loaded records is a classwide issue judicable on a classwide basis.

At bottom, these circumstances, unlike those in *Ragsdale*, counsel against bifurcation. In *Ragsdale*, there was a pure individualized issue of consent that was only weakly controverted. But here, additional factors, including the Plaintiff's declaration and the passage of time between the purported consent, together with equally as plausible classwide explanations addressing the Defendant's theory, counsel against bifurcation here. Indeed, in *Ragsdale*, unlike here, the Defendant relied upon *actual evidence of consent*; here, the Defendant *admits* it has no consent. The best it can muster is some rank speculation that the Plaintiff must have checked the box because she received messages four years after the fact. But as the Plaintiff points out, it is equally as plausible that the box was unchecked, and for some reason, that fact was either lost, discarded, or improperly recorded, resulting in the Plaintiff and all other class members receiving the subject messages, despite not having consented. Here, by contrast, Plaintiff's claims arise from systemic conduct that likely affected an entire class of former customers who were all harmed in the same way and by the same deficiency in recording and honoring consent.

The core class issue is whether BioTrust implemented a business practice that resulted in unlawful text messages being sent without regard to proper recording of each individual's consent, not whether each individual consented or not.

Because this case focuses on company-wide practices and issues bearing on the entire class, bifurcation and the proposed protective order would prevent necessary discovery into those practices and would frustrate Plaintiff's ability to prove both her individual claim and the class claims. The Defendant's proposal to bifurcate discovery into two distinct phases is the opposite of judicial economy because this case provides far more disputed issues than the clear-cut consent issues in *Ragsdale*. Put simply, *Ragsdale* provided easy answers to an individualized consent issue that this case simply does not lend itself to. To the contrary, any such issues will be easily addressed and adjudicated class-wide. In cases such as here, with such significant overlap between individual and class issues, bifurcation serves only to multiply discovery disputes, delay resolution, and impose unnecessary costs on the parties and the Court.

## CONCLUSION

The Court should therefore deny the Defendant's motions to bifurcate and for a protective order in all respects.

Dated: July 18, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 18, 2025, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by email to all parties who have appeared by operation of the

court's electronic filing system.

Dated: July 18, 2025

/s/ Andrew Roman Perrong
Andrew Roman Perrong, Esq.
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com
